# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## CHARLESTON DIVISION

LAURA ANN HAWKINS,

        Plaintiff,

v.                                CIVIL ACTION NO.  2:16-cv-09131

NANCY A. BERRYHILL,
Commissioner of Social Security,

        Defendant.

## MEMORANDUM OPINION AND ORDER

This action was referred to United States Magistrate Judge Dwane L. Tinsley for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636. On March 2, 2018, Judge Tinsley submitted his Proposed Findings and Recommendations [ECF No. 15] (PF&R"), recommending that the court grant the plaintiff's request for judgment on the pleadings [ECF No. 10], deny the defendant's request for judgment on the pleadings as articulated in her brief in support of the Commissioner's decision [ECF No. 13], reverse the final decision of the Commissioner, and remand this case for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). The Commissioner filed an Objection [ECF No. 16] to the PF&R. The claimant filed a Response [ECF No. 17].

For the reasons provided herein, the court **SUSTAINS** the Commissioner's objections [ECF No. 16], **DECLINES TO ADOPT** the PF&R [ECF No. 15], **DENIES**

the plaintiff's motion for judgment on the pleadings [ECF No. 10], **GRANTS** the defendant's motion for judgment on the pleadings as articulated in her brief in support of the Commissioner's decision [ECF No. 13], **AFFIRMS** the decision of the Commissioner, and **DISMISSES** this matter from the court's docket.

## I.    Background

### a.  Procedural History

The claimant, Laura Ann Hawkins, filed an application for disability insurance benefits on May 2, 2013, alleging disability beginning February 13, 2012. The application was denied initially on August 13, 2013, and upon reconsideration on October 28, 2013.

Pursuant to the claimant's request, a video hearing was held on February 11, 2015. Administrative Law Judge John T. Molleur (the "ALJ") presided. On March 3, 2015, the ALJ issued his decision denying the claimant's application. He found that the claimant satisfied step one of the sequential evaluation because she has not engaged in substantial gainful activity since the alleged onset date of February 13, 2012, and she meets the insured status requirements of the Social Security Act through June 30, 2017. Tr. Proceedings 13 [ECF No. 9-2] ("Tr."). As to the second step, the ALJ found that the claimant suffers from the following severe impairments: degenerative disc disease of the lumbar and cervical spine, bilateral hip bursitis, diabetes, migraines, and obesity. *Id.* As to the third step, the ALJ concluded that the claimant did not have an impairment or a combination of impairments that met or

medically equaled the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 16. The ALJ next found that the claimant had a residual functional capacity to perform light work with certain listed limitations. Tr. 17. At step five, and on the basis of the testimony of a vocational expert, the ALJ determined that the claimant could perform jobs that exist in significant numbers in the national economy, such as a cashier, fast food worker, and customer service cashier I/head cashier. Tr. 24–25. On this basis, the claimant's application was denied.

The ALJ's decision became the final decision of the Commissioner on July 28, 2016, when the Appeals Council denied the claimant's request for review. Tr. 1. The claimant filed this action seeking judicial review of the Commissioner's decision on September 26, 2016. Compl. [ECF No. 1].

## II.    Standards of Review

### a.  Review of the PF&R

A district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). This court is not, however, required to review, under a de novo or any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the findings or recommendation to which no objections are addressed. *Thomas v. Arn,* 474 U.S. 140, 150 (1985).

### b.  Review of the ALJ's Findings and Decision

The Social Security Act states that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "In reviewing for substantial evidence, [the court should] not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] own judgment for that of the [Commissioner]." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)). Rather, the court must adopt the Commissioner's findings if there is evidence in support of such findings "to justify a refusal to direct a verdict were the case before a jury." *Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). Thus, even if the court would have reached a different decision, it must nonetheless defer to the conclusions of the ALJ if such conclusions are bolstered by substantial evidence and were reached through a correct application of relevant law. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A claimant "bears the burden of proving that he is disabled within the meaning of the Social Security Act." *English v. Shalala*, 10 F.3d 1080, 1082 (4th Cir. 1993) (citing 42 U.S.C. § 423(d)(5); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981)). Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

In order to determine whether an individual is disabled, the Commissioner uses a five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520(a).

> [T]he ALJ asks at step one whether the claimant has been working; at step two, whether the claimant's medical impairments meet the regulations' severity and duration requirements; at step three, whether the medical impairments meet or equal an impairment listed in the regulations; at step four, whether the claimant can perform her past work given the limitations caused by her medical impairments; and at step five, whether the claimant can perform other work.

*Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015). The claimant bears the burden of proof at steps one through four, and the Commissioner bears the burden at step five. If an individual is found "not disabled" at any step, further inquiry is unnecessary. 20 C.F.R. §§ 404.1520(a).

III.    Discussion

a.  Review of PF&R

The Magistrate Judge recommended remand on the basis that the ALJ did not specify the frequency or intensity required under Listing 11.03, and that he did not identify why he determined that the claimant's migraines did not meet or equal the Listing. *See* PF&R 6–7 [ECF No. 15]. The Commissioner argues that (1) to the extent the Magistrate Judge's recommendation is based on the ALJ's failure to state verbatim the requirements of Listing 11.03, he was not required to do so; and (2) to the extent the Magistrate Judge's recommendation is based on the ALJ's failure to set forth a detailed reasoning in the step-three section of his decision, the ALJ set forth substantial evidence supporting his step-three determination throughout the entirety of his decision. *See* Def.'s Obj. R. & R. 2, 5 [ECF No. 16]. The court agrees.

Under the third step of the sequential evaluation, the ALJ must determine whether the claimant's impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations. 20 C.F.R. §§ 404.1520(d)). The listings set out in the appendix "are descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect. Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results." *Sullivan v. Zebley*, 493 U.S. 521, 529–30 (1990).

ALJs are not required to explicitly identify and discuss every possible listing. *Ezzell v. Berryhill*, 688 F. App'x 199, 200 (4th Cir. 2017). However, "[w]hen there is 'ample evidence in the record to support a determination' that the claimant's impairment meets or equals one of the listed impairments, the ALJ must identify 'the relevant listed impairments' and compare 'each of the listed criteria to the evidence of [the claimant's] symptoms.'" *Id.* (citing *Cook v. Heckler*, 783 F.2d 1168, 1172–73 (4th Cir. 1986)).

"An ALJ's explanation for their step-three determination is insufficient if they state only that they considered the listing of impairments and 'offer [ ] nothing to reveal *why*' they made their determination." *McDaniel v. Colvin*, No. 2:14-cv-28157, 2016 WL 1271509, at *4 (S.D. W. Va. Mar. 31, 2016) (quoting *Fox v. Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015)). The "insufficient legal analysis makes it impossible for a reviewing court to evaluate whether substantial evidence supports the ALJ's findings." *Johnson v. Berryhill*, No. 2:17-cv-01608, 2018 WL 1096463, at *10 (S.D. W. Va. Feb. 1, 2018), adopted by 2018 WL 1095581 (citations omitted).

"However, if the ALJ's opinion read as a whole provides substantial evidence to support the ALJ's decision at step three, such evidence may provide a basis for upholding the ALJ's determination." *McDaniel*, 2016 WL 1271509, at *4 (citations omitted); *see Six v. Colvin*, No. 3:15-cv-14377, 2016 WL 7040850, at *2–3 (S.D. W. Va. Dec. 1, 2016). ALJs only need to "review medical evidence once in [their] opinion[s]." *McDaniel*, 2016 WL 1271509, at *4 (quoting *McCartney v. Apfel*, 28 F. App'x 277, 279

(4th Cir. 2002)). Thus, "[a] cursory explanation in step three is satisfactory so long as the decision as a whole demonstrates that the ALJ considered the relevant evidence of record and there is substantial evidence to support the conclusion." *Id.* (citations omitted).

In the step three section of his decision in this case, the ALJ determined:

> The claimant's migraines are most closely evaluated under Section 11.03 of the Listings. However, the claimant's migraines do not meet or equal the criteria of the listing because there is no evidence they occur with the frequency or intensity required by the listing in spite of at least three months of prescribed treatment.

Tr. 17. The ALJ clearly identified the Listing he was using to conduct his evaluation, and it was the appropriate Listing. *See Keller v. Colvin*, No. 1:13-cv-00104-TWP-MJD, 2014 WL 948889, at *5 (S.D. Ind. Mar. 10, 2014) ("[M]igraines, though unlisted, may be medically equivalent to Listing 11.03."). Although the ALJ did not recite the frequency or intensity required by the Listing, there is no express requirement that he do so. Even if there were such a requirement, the ALJ's omission would be harmless error. *See Connor v. U.S. Civil Serv. Comm'n*, 721 F.2d 1054, 1056 (6th Cir. 1983) ("[A]n agency's violation of its procedural rules will not result in reversible error absent a showing that the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses."); *see also Morgan v. Barnhart*, 142 F. App'x 716, 722–23 (4th Cir. 2005). A simple review of the Listing in place at the time of the ALJ's decision reveals its explicit requirements:

> 11.03 Epilepsy—nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.03 (2015). Therefore, the ability of the court to review the decision is not adversely affected by the ALJ's failure to reproduce the requirements of this Listing in his decision.

Furthermore, although the ALJ did not set forth a detailed analysis in the step three section of his decision, the decision as a whole makes clear that his step three analysis addressing the claimant's migraines is supported by substantial evidence. *See Marcum v. Berryhill*, No. 16-2297, 2017 WL 1095068, at *4 (S.D. W. Va. Mar. 23, 2017) ("Because the ALJ is only required to review medical evidence once in his decision . . . if elsewhere the ALJ includes 'an equivalent discussion of the medical evidence relevant to [the] Step Three analysis,' remand of the case is not required.") (quoting *McDaniel v. Colvin*, 2016 WL 1271509, at *4). The ALJ discusses at length the evidence concerning the claimant's migraines. *See* Tr. 18–24. He describes her subjective complaints, the impressions of her treatment providers, the treatment she has received, and the results of this treatment. He notes that the claimant has reported migraines all her life, but had previously been able to work despite the

condition. Tr. 22–23. Based on all of the evidence, he even makes the explicit finding that

> despite evidence to the contrary, medication has been
> effective in treating the claimant complaint of migraine.
> For example, on January 19, 2013, the claimant reported
> to Dr. Shramowiat that Relpax was effective in alleviating
> her headaches if she took it at the earliest onset (Exhibit
> *5F*, p.11). She also reported on October 27, 2014, that
> injectable lmitrex was effective for treatment of her
> migraine. The claimant also indicated she performed such
> daily activities as watching television, read books, and
> using the computer, which no apparent difficulty.

I find that ALJ's step three findings regarding the claimant's migraines, when viewing the opinion as a whole, comply with applicable law and are supported by substantial evidence. Therefore, the defendant's objection is **SUSTAINED.**

### b. Review of Commissioner's Decision

The Magistrate Judge recommended remand, and decided to "make[] no recommendation as to Claimant's remaining arguments as those issues may be addressed on remand." PF&R 7. Because I have chosen not to remand the case on the basis suggested by the Magistrate Judge, his failure to address these motions requires that I conduct a de novo review addressing all of the pertinent issues.

### i. Relevant Factual Background

While the court has reviewed all evidence of record, only the notations most relevant to the disputed issues are summarized below:

### 1. Treatment Records

Although the court's analysis is based on the medical records during the period

10

relevant to the claimant's allegations of disability, the court notes that, previous to this period, the claimant underwent a hysterectomy and a bladder re-tack and sling. Tr. 391.

On March 14, 2012, the claimant saw her regular treatment provider, Heather Straight, D.O. Tr. 390. Dr. Straight's report references the claimant's ongoing complaints of urinary incontinence and noted no change in the condition.[1] Tr. 393.

On April 9, 2012, the claimant saw Michael Shramowiat, M.D. of the Mountaineer Pain Relief and Rehabilitation Center. Tr. 311. The claimant reported "lack of bladder control." *Id.*

On March 25, 2013, the claimant again saw Dr. Straight. Tr. 357. Dr. Straight reported that the claimant described her incontinence as "worse over time." *Id.* However, Dr. Straight's impression of the incontinence remained "unchanged." Tr. 360.

The claimant went to the emergency room on May 16, 2013, complaining of dysuria and reporting blood in her urine. Tr. 262. Her treatment provider's impression was that the claimant was suffering from a urinary tract infection. Tr. 263. However, when Dr. Straight conducted a urinalysis of the claimant on May 29, 2013, she concluded that the patient likely did not have a urinary tract infection and that the urinary analysis was probably showing a contaminant. Tr. 352, 355. She believed the claimant's hematuria may be secondary to the vaginal bleeding. Tr. 355.

---

[1] The claimant also saw Dr. Straight on June 20, 2012, Tr. 384, and December 20, 2012, Tr. 377. Dr. Straight noted no change in the claimant's incontinence on these occasions.

Dr. Straight also noted the claimant continued to complain of incontinence and that she "may need to see urology." *Id.*

On October 1, 2013, the claimant told Dr. Straight that the incontinence had gotten worse over time, that she was often unable make it to the bathroom in time, and that she had poor bladder control. Tr. 476. Dr. Straight referred the claimant to urologists, David C. Mendoza, M.D. and Robert Waskey, FNP-BC. Tr. 473, 479. Dr. Mendoza and Mr. Waskey reported that the claimant was experiencing urgency, having one to two accidents per day, and using panty liners. Tr. 473. They also acknowledged that she had a bladder sling procedure six years prior and that she reported this had helped her incontinence for a "short time." *Id.* The claimant was prescribed Toviaz. Tr. 475. The follow-up plan included a bladder scan and a follow-up visit. *Id.*

The patient again saw Dr. Mendoza and Mr. Waskey on November 18, 2013. On this visit, she reported that the Toviaz, which she had been taking for approximately one month, Tr. 471, 475, had helped her incontinence. Tr. 471. In fact, she reported no accidents since she had started taking the medication. *Id.* Dr. Mendoza and Mr. Waskey stated that the claimant's condition had improved and that she was tolerating the medication well. Tr. 471–72.

On January 2, 2014, the plaintiff presented to Dr. Straight, complaining of dysuria. Tr. 459. Dr. Straight completed a urinary analysis, which showed microscopic hematuria but was negative for infection. Tr. 459. Dr. Straight also noted

that the claimant had previously been prescribed Toviaz, which had helped for a while but symptoms had since worsened. Tr. 459. Dr. Straight's impression was that the dysuria had worsened, and her plan was to again refer the claimant to urology, perhaps for a cystoscopy. Tr. 462.

On January 13, 2014, the claimant again saw Dr. Mendoza. Tr. 486. The claimant complained of blood in her urine and received a re-check of her urinary incontinence, which the claimant reported was worsening. *Id.* Dr. Mendoza diagnosed the claimant with gross hematuria. Tr. 487. An ultrasound of the claimant's kidneys was performed at Parkersburg Radiology Services on January 28, 2014. Tr. 495. The impression of the treatment provider was that the ultrasound was "unremarkable." *Id.*

On February 7, 2014, a cystoscopy, bilateral retrograde, and pelvic exam of the claimant confirmed the following diagnoses: microscopic hematuria, mixed urinary incontinence with cystocele and possible enterocele. Tr. 575

The claimant saw Dr. Mendoza on February 20, 2014, for a re-check regarding the blood in her urine. Tr. 665. Dr. Mendoza referred the claimant to Robert Shapiro, M.D. in Morgantown for a possible replacement of her bladder sling. Tr. 666.

On February 20, 2014, the claimant underwent a retrograde urogram at the Camden Clark Medical Center. Tr. 572. The urogram showed no persistent filling defects. *Id.* There was no mass effect or obstruction. *Id.* The retrograde urogram was "negative." *Id.*

Dr. Straight saw the claimant for a checkup on April 1, 2014. Tr. 659. She noted that the claimant was "[s]cheduled with a specialist of urology/OB GYN for pending mesh replacement 5/6/2014." *Id.* She also noted that the status of the incontinence was "unchanged," and would hopefully improve with the claimant's upcoming mesh replacement. Tr. 662.

On May 6, 2014, the claimant saw Dr. Shapiro. Tr. 582. The claimant reported "chronic urgency and frequency that ha[d] worsened over the past several months and [was] now interfering with activities of daily living." *Id.* She reported leakage of urine and urinating 15–20 times per day. *Id.* Dr. Shapiro found no evidence of mesh erosion or extrusion into the vagina. Tr. 584. Dr. Shapiro scheduled complex urodynamics to further evaluate the claimant's bladder control. Tr. 585. He also "strongly advise[d] a medical / behavioral treatment approach," including scheduled voiding, weight loss, caffeine reduction, fluid management/restriction, and Kegel exercises. *Id.* He offered the claimant a prescription for pelvic floor physical therapy, but she declined stating that she wished to speak with her orthopedist first. *Id.*

The claimant underwent complex urodynamics and rigid cystourethroscopy on June 13, 2014. Tr. 592. Dr. Shapiro's postoperative diagnosis was urgency, frequency, and urinary incontinence. *Id.* His findings included detrusor overactivity and no evidence for occult urinary stress incontinence with reduction of mild prolapse. *Id.* An ultrasound of the kidneys reported the same day was "unremarkable" and revealed a postvoid residual of 49 ml. Tr. 598.

14

On August 22, 2014, the claimant saw Pamela Parker, FNP. Tr. 644. She complained of moderate dysuria. *Id.* She was advised to drink less coffee, tea, and soda, and to drink more water. Tr. 646.

On September 14, 2014, an ultrasound of the claimant's abdomen and liver was conducted at Parkersburg Radiology Services. Tr. 675. It detected no abnormality of the liver and no hydronephrosis in her kidneys. *Id.*

The claimant again saw Dr. Shapiro on September 30, 2014. Tr. 600. He indicated that the claimant had "tried 2 different types of anticholinergic medication without [a]ny significant improvement." Tr. 600. Dr. Shapiro discussed Botox injections as a possible treatment for "refractory urinary urgency and frequency with chronic pelvic pain (neurogenic detrusor activity)." Tr. 602.

On October 8, 2014, the claimant saw Dr. Straight for a check-up. Tr. 632. She noted that the claimant was following up with West Virginia University Urology for "incontinence with planned Botox procedure." *Id.*

On December 5, 2014, the claimant reported to Dr. Shapiro. Tr. 719. He noted that the claimant had "tried numerous therapies including behavioral modification and multiple anticholinergic medication. None of these therapies have helped her with her problem. She presents to me desiring injection of Botox into the bladder." *Id.* The records also describe the procedure and the aftermath and state that the patient will be shown how to self-catheterize if she is unable to successfully void alone while in the recovery room. *Id.*

On December 11, 2014, the claimant saw Dr. Straight with complaints of urinary frequency, urinary urgency, and nocturia. Tr. 699. Dr. Straight conducted a urinalysis, Tr. 703, and ultimately instructed the claimant to follow up with her urologist and to improve control of her diabetes. Tr. 701.

The claimant returned to Dr. Shapiro on December 17, 2014. Tr. 725. She complained of an inability to fully empty her bladder and some associated frequency. *Id.* Dr. Shapiro instructed the claimant on intermittent self-catheterization and prescribed Ditropan XL, with plans to re-evaluate in two weeks. Tr. 727.

On December 21, 2017, the claimant went to Marietta Memorial Hospital complaining that her bladder was not fully draining. Tr. 732. Dr. Julian Jakubowski, DO evaluated the claimant. *Id.* A post-voiding bladder scan was conducted and showed a retained volume of 31 to 50 ml. Dr. Jakubowski discussed with the patient "how the bladder scan was not suggestive of urinary retention." Tr. 739. He also told her he suspected she had urinary tenesmus. *Id.* He diagnosed the claimant with lower urinary tract infectious disease, which he informed her may be a result of her hyperglycemia. Tr. 739. He advised her that her hyperglycemia needed to be closely monitored. *Id.*

## 2. The Claimant's Testimony

At the administrative hearing, the claimant testified that she lived with her 20-year-old son and her partner. Tr. 37. She was born in 1968. Tr. 38. She graduated high school. *Id.* She confirmed that she had worked at Walmart for a number of years,

but she had gone on short-term disability and was eventually terminated when she was unable to return to work. *Id.* The claimant described problems with hip and back pain, Tr. 40–41, migraine headaches, Tr. 41, chronic cough and shortness of breath, Tr. 45, and obesity, Tr. 48.

Regarding her incontinence, the claimant testified that she had been having problems with her bladder, specifically urgency and frequency, for several years. Tr. 43. She had a bladder sling implanted several years ago, and that helped "just for a little while." *Id.* She testified that three or four years ago, the issues began to worsen. *Id.* With the increase in her back pain, she felt like she "needed to go more" and "couldn't hold it." *Id.* She confirmed that she had tried several medications with no success. *Id.* She also received Botox treatments, which only worsened the condition. *Id.* She stated that she needed to use the bathroom two to four times per hour, and that this had worsened with the Botox. 44. She also confirmed a history of frequent urinary tract infections. *Id.* In fact, since her Botox procedure, she claimed to have had four urinary tract infections. *Id.* She testified that she had problems with leakage or incontinence a few times a day, and that a few times a week, the problem was significant enough that she needed to change her clothes. *Id.* She also stated that she was using a panty liner to attempt to control the issues. *Id.*

### ii. Discussion

The plaintiff presented two issues in this action: (1) whether the ALJ failed to complete a full and fair analysis of the medical evidence before finding the claimant's

urinary incontinence was not a severe impairment; and (2) whether the ALJ's pain analysis and credibility findings, with respect to the claimant's urinary incontinence, were not in compliance with regulatory and case law.

## 1. Severity Analysis

In step two of his analysis, the ALJ found that the claimant's urinary incontinence was not a severe impairment. Tr. 15. The claimant asserts that the ALJ did so "based on his own incorrect and incomplete recitation of the facts." Pl.'s Mem. Support J. Pleadings 9 [ECF No. 10] ("Pl.'s Mem."). However, while the ALJ is required to *consider* all of the evidence in the case record when making a disability determination, 20 C.F.R. § 404.1520(a)(3), he is not required to *refer* to all of the evidence in his decision. *See Reid v. Comm'r Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (per curiam)). The decision must "contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the [ALJ's] determination and the reason or reasons upon which it is based." *Id.* (quoting 42 U.S.C. § 405(b)(1)). The ALJ did so.

The ALJ discussed the claimant's medical history of incontinence, setting forth pertinent details of her treatment:

> On May 29, 2013, the claimant presented to Heather Straight, D.O., in follow-up of an emergency room visit after noticing blood in her urine . . . . Dr. Straight stated the claimant likely did not have a urinary tract infection, as it was more likely contaminant . . . . A cytology report dated January 16, 2014, showed the claimant had

impression of scattered reactive urothelial cells with numerous benign squamous cells and no evidence of dysplasia or malignancy . . . . The claimant was prescribed Toviaz due to complaint of incontinence urge and stress . . . .[T]he claimant reported her condition was improved with Toviaz. . . . On June 14, 2014, the claimant underwent complex urodynamics and rigid overactive detrusor. . . . During a follow-up on September 30, 2014, Dr. Shapiro explained . . . Botox was a new FRD approved procedure for treatment of refractory urinary and frequency . . . . On December 5, 2014, the claimant underwent cystoscopy and Botox injection for the overactive bladder . . . . During an emergency room visit on December 21, 2014, it was discussed with the claimant that her bladder scan was not suggestive of urinary retention.

Tr. 14–15. The ALJ cited to a significant portion of the claimant's relevant medical records in his discussion of the evidence regarding her incontinence. Although the ALJ does not discuss the claimant's testimony during his step two analysis, he discusses it later in his decision, clearly demonstrating that he fully considered the testimony. *See* Tr. 18. Not only did the ALJ state that his decision was made "[a]fter careful consideration of all the evidence," Tr. 11, his recitation of the facts demonstrates that he considered evidence throughout the record. Tr. 14–15. *See Reid*, 769 F.3d at 865 ("The Commissioner, through the ALJ . . ., stated that the whole record was considered, and, absent evidence to the contrary, we take her at her word.) (citing *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005)).

Furthermore, I restate for emphasis, the deference that must be given to the decision of the ALJ: "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the

[Commissioner] (or the [Commissioner's] designate, the ALJ)." *Walker*, 834 F.2d at 640. Regardless of the decision the court would have reached, as long as the ALJ's decision complies with the law and is supported by substantial evidence, I must defer to his decision. The ALJ decided that the claimant's "incontinence [is] not severe, as [it is] stable and effectively maintained with medication." Tr. 15. Substantial evidence in the record supports this determination.

Therefore, I find the ALJ's decision regarding the severity of the claimant's incontinence complies with applicable law. Furthermore, I find that, taking the record as a whole, there is substantial evidence to support the ALJ's decision that the claimant's incontinence was not a severe impairment.

## 2. Assessment of Subjective Complaints

The next issue raised by the claimant is based on the ALJ's evaluation of the claimant's alleged symptoms related to her incontinence. Pl.'s Mem. 11. In his evaluation, the ALJ found that "the evidence does not support the limitations alleged by the claimant and reveals she is not fully credible regarding the severity of her condition." Tr. 18. While he acknowledges "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms," he found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for reasons explained in this decision." *Id.* The claimant argues that the ALJ did not examine the entirety of the evidence regarding her incontinence and did not set forth the reasons for his

determination. Pl.'s Mem. 13–15. She also argues that his determination is not based on substantial evidence. *Id.* at 15.

At the time of the ALJ's decision in this case, SSR 96-7p was in effect. This Ruling requires the adjudicator, in evaluating the credibility of an individual's statements, to "consider the entire case record and give specific reasons for the weight given to the individual's statements . . . . The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision." SSR 96-7p, 1996 WL 374186 (July 2, 1996). The adjudicator "may find all, only some, or none of an individual's allegations to be credible . . . . The adjudicator may also find an individual's statements . . . to be credible to a certain degree. *Id.* The ALJ is required to evaluate the factors set forth in the regulations[2] and the additional factors set forth in SSR 96-7p.[3]

The ALJ discussed the claimant's own testimony regarding her incontinence. *See* Tr. 18. He acknowledged her medical history of bladder issues and the various methods of treatment she had attempted, including her sling implant and her Botox

---

[2] The factors set forth in the regulations are (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate the individual's symptoms; (5) treatment, other than medication, the individuals receives or has received for relief of the pain or other symptoms; (6) any measures the individuals has used to releve pain or other symptoms; and (7) other factors concerning the functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. 404.1529(c).

[3] The factors set forth in SSR 96-7p are: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions; (3) statements and reports from the individuals and from treating physicians or psychologists, or other persons, regarding the individual's medical history, treatment and response, prior work record, daily activities, and other information concerning the individual's symptoms. SSR 96-7p, 1996 WL 374186 (July 2, 1996).

injections. *Id.* He also acknowledged her testimony that these treatments had not been effective. *Id.* He discussed her testimony regarding her current symptoms, including her need to urinate two to four times per hour and her urinary leakage. *Id.* The ALJ also discussed the claimant's testimony regarding her daily activities. He detailed the claimant's daily routine and determined that the claimant "functions at a higher level than alleged." Tr. 23.

The ALJ also discussed the claimant's medical records, as they relate to incontinence, in detail during his step two analysis. Tr. 14–15; *see supra* pp. 19–20. He discussed various symptoms, diagnoses, and attempts at treatment, from the perspectives of the treatment providers and the claimant. From these records, the ALJ concluded that the claimant's incontinence was "stable and effectively maintained with medication." Tr. 15. The claimant argues that this is not a sufficient discussion of the medical evidence, which is required for the ALJ's credibility analysis. However, as previously stated, though the ALJ is required to review all of the evidence on the record, the ALJ is not required to refer to all of it in his decision. *Reid v. Comm'r Soc. Sec.*, 769 F.3d at 865. Nor is he required to restate the evidence in every relevant portion of the decision. *See McCartney v. Apfel*, 28 F. App'x 277, 279 (4th Cir. 2002) ("The ALJ need only review medical evidence once in his opinion."). The ALJ states that his credibility decision is based on "careful consideration of the evidence" and is made "for the reasons explained in this decision."

The ALJ did not err by relying on medical evidence that he had previously discussed in arriving at his credibility conclusion.

Finally, the ALJ addressed the opinion evidence, including a psychological evaluation by John Atkinson, Jr., M.A., a General Physical form completed by L.R. Auvil, M.D., a questionnaire completed by Heather Straight, D.O., and a physical residucal capacity evaluation completed by Thomas Lauderman, D.O. *See* Tr. 23–24. In each case, he stated the weight he was according the opinions and explained his reasons for doing so. *See id.* Specifically, he gave "great weight" to the opinion of Dr. Lauderman, stating that his finding that "the claimant could perform light exertion with occasional performance of all postural activities" was supported by treatment notes of Dr. Straight and Dr. Shramowiat. Tr. 24.

From the ALJ's discussion of the evidence, it is clear that he reviewed and considered the entirety of the record. Furthermore, based on the weight he assigned the evidence, it is clear how he arrived at his decision. The ALJ does not dispute the claimant's allegations that she suffers from incontinence. He merely finds that she is not fully credible regarding the severity of her condition and the related symptoms. Based on the medical records (including but not limited to laboratory findings, diagnoses, and impressions of the treating physicians), the opinions of medical experts, the claimant's statements regarding her own condition (both as summarized in her medical records and as stated at her administrative hearing), and the claimant's statements regarding her daily activities, there is substantial evidence to

support this credibility determination.

For the reasons stated above, I find the ALJ's decision regarding the claimant's subjective complaints of her incontinence complies with applicable law and is supported by substantial evidence.

## IV. Conclusion

For the reasons stated in the Memorandum Order and Opinion, the court **SUSTAINS** the Commissioner's objections [ECF No. 16], **DECLINES TO ADOPT** the PF&R [ECF No. 15], **DENIES** the plaintiff's motion for judgment on the pleadings [ECF No. 10], **GRANTS** the defendant's motion for judgment on the pleadings as articulated in her brief in support of the Commissioner's decision [ECF No. 13], **AFFIRMS** the decision of the Commissioner, and **DISMISSES** this matter from the court's docket.

The court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record and any unrepresented party.

ENTER:      March 30, 2018

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE